IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TASHA KICHLINE, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | NO. 20-2151 |

## MEMORANDUM OPINION

**Timothy R. Rice**　　　　　　　　　　　　　　　　　　　　　　　　June , 2021
**U.S. Magistrate Judge**

　　Plaintiff Tasha Kichline alleges the Administrative Law Judge ("ALJ") erred in denying her Disability Insurance Benefits ("DIB") by failing to: (1) find her headaches severe; (2) properly weigh her medical source opinions; (3) support his Residual Functional Capacity ("RFC")[1] analysis with substantial evidence; and (4) properly consider the Vocational Expert ("VE") testimony. Pl. Br. (doc. 16) at 14-15. Because the ALJ supported each part of his determination with substantial evidence, I deny Kichline's claim.[2]

　　Kichline was 30 years old at her Date Last Insured ("DLI")[3] on June 30, 2016. R. at 148.

---

[1]　　A claimant's RFC reflects "the most [she] can still do [in a work setting] despite [her] limitations." 20 C.F.R. §§ 404.1545(a).

[2]　　Kichline consented to jurisdiction of a United States Magistrate Judge on June 1, 2020 (doc. 7), pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 72, Local Rule 72.1, and Standing Order, In re Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018).

[3]　　To qualify for DIB, claimants must establish their disability began before their DLI. 20 C.F.R. §§ 404.130, 404.132; see also Jakubowski v. Comm'r of Soc. Sec., 215 F. App'x 104, 105 (3d Cir. 2007) (claimant must show disability onset date before "expiration of her disability insured status"), De Nafo v. Finch, 436 F.2d 737, 739 (3d Cir. 1971) (noting claimant must demonstrate disability on or before the date he "last met the earnings requirements under the Social Security Act" to obtain benefits).

She suffers from fibromyalgia[4] and significant mental impairments. Id. at 148, 954. She alleges that she has been disabled since March 2011, although she submitted only sporadic treatment records before late 2014 because she lacked health insurance. Id. at 438-42. Kichline's claim was originally denied in 2018. Id. at 1087. I remanded it for reconsideration in 2019 because the ALJ had: (1) improperly rejected the opinion of Kichline's primary care provider; and (2) found her capable of performing jobs that were outside of his prescribed RFC. Id. at 1060-61, 1078-79.

In his 2020 opinion, the ALJ relied on different evidence to discredit the same opinion. Id. at 965. He adequately explained that his RFC of a restricted range of sedentary work accommodated almost all of her reported symptoms, but not her contentions that her symptoms would preclude full-time work by requiring excessive absences. Id. at 958. Most of the evidence Kichline describes as inconsistent with the ALJ's determination are medical notes enumerating her subjective complaints; there is scant objective evidence supporting the functional limitations she claims. Nonetheless, the ALJ did not simply discredit Kichline's complaints. Instead, he largely accommodated them with his restrictive RFC. Id.

---

[4] Fibromyalgia is pain and stiffness in the muscles and joints that either is diffusive or has multiple trigger points. Dorland's Illustrated Medical Dictionary 711 (32d ed. 2012). There are 18 trigger-point sites located on each side of the body at: the base of the skull; the back and side of the neck; the shoulder; near the shoulder blade; the top of the rib cage near the sternum; the outer aspect of the elbow; the top of the buttock; below the hip; and the inner aspect of the knee. Titles II & XVI: Evaluation of Fibromyalgia, ("Eval. of Fibro.") SSR 12-2P, 2012 WL 3104869, at *3 (2012); Memo. from the Deputy Comm'r for Disability & Income Sec. Programs to Verrell L. Dethloff, ALJ (May 11, 1998) (on file with Disability Benefits Information Website). A point is tender if a person experiences pain when pressure is applied to the site. Eval. of Fibro., at *3. Fibromyalgia may be shown where a physician finds a claimant has at least 11 positive tender points on the left and right side of her body during a physical examination. Id.

This RFC does not suggest that Kichline could return to her past work, which the VE categorized as medium.[5]  Id. at 70.  It also does not suggest that her manual dexterity would allow her to be a full-time musician, as she might prefer.  Id. at 1434.  It does, however, in combination with the VE testimony, suggest that there are a limited number of jobs in the national economy Kichline could perform full-time.

I. <u>Failing to Find her Headaches were a Severe Impairment</u>

Kichline argues the ALJ erred by finding her migraine headaches were not severe.  Pl. Br. at 16.  Citing medical records documenting her headache complaints to providers in multiple specialties, she argues this condition precludes full-time work by requiring excessive absences and limiting her ability to concentrate and focus.  Id. at 18.

The ALJ supported his assessment of Kichline's headaches with substantial evidence.  He explained that he did not find the migraines severe because they: (1) did not result in significant functional limitation; (2) were "relatively short-lived"; and (3) could be "resolved by medication."  R. at 956.  As part of his RFC analysis resulting in a limited scope of sedentary work, he specifically found her ability to focus and concentrate only "moderately" limited.  Id. at 957.  He concluded that the reported severity of her symptoms was "inconsistent" with her alleged limitations "because the record simply does not support" them.  Id. at 963.

Although the burden of establishing a severe impairment "is not an exacting one," <u>McCrea v. Comm'r of Soc. Sec.</u>, 370 F.3d 357, 360 (3d Cir. 2004) (a medically determinable impairment is severe as long as the claimant demonstrates "something beyond 'a slight abnormality or a combination of abnormalities which would have no more than a minimal

---

[5]  Medium work requires lifting up to 50 pounds occasionally and/or up to 25 pounds frequently.  20 C.F.R. § 404.1567(c).

3

effect on an individual's ability to work.'"), "[m]ere diagnosis alone . . . does not reveal the degree of functional limitation." Maddaoni v. Comm'r Soc. Sec., 340 F. App'x 800, 802 (3d Cir. 2009). Moreover, regardless of an alleged impairment's severity, an ALJ must analyze any functional limitations it causes when determining a claimant's RFC. 20 C.F.R. § 404.1545(a)(2).

Thus, erroneously finding an impairment non-severe at step two may be harmless if the ALJ considers the alleged functional effects of that impairment in assessing a claimant's RFC. See, e.g., Astacio-Rivera v. Berryhill, No. 16-1276, 2017 WL 2296976, at *5 (E.D. Pa. Apr. 12, 2017), report and recommendation adopted, No. 16-1276, 2017 WL 2277275 (E.D. Pa. May 25, 2017) (citing Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her impairments were non-severe, any error was harmless.")); Lee v. Astrue, 2007 WL 1101281, at *3 n.5 (E.D. Pa. Apr. 12, 2007) (flawed determination at step two would not warrant remand if the ALJ properly considering both severe and non-severe limitations at step five). Harmless errors do not warrant remand. Shinseki v. Sanders, 556 U.S. 396, 406 (2009) (the harmless-error rule applies to judicial review of administrative proceedings); Woodson v. Comm'r Soc. Sec., 661 F. App'x 762, 766 (3d Cir. 2016) (same) (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005)).

Kichline cites her own testimony and medical records from six specialists and a consulting physician to argue that the ALJ's conclusions are inaccurate. Pl. Br. at 16-17. These records fail to undermine the ALJ's analysis because they document only Kichline's subjective complaints. R. at 239, 247, 254, 294, 298, 372, 450-52, 729, 734, 739, 744, 749, 754, 758, 762, 766, 768, 866, 872, 881, 926, 933, 1434, 1601, 1611, 1615, 1620, 1625, 1630, 1635, 1640, 1646; see also Kanakis v. Comm'r of Soc. Sec., 649 F. App'x 288, 292 (3d Cir. 2016) (upholding ALJ

4

determination discrediting physician opinion in part "because it was based primarily on [the claimant's] 'subjective assertions at the time of the examination'"); Robinson v. Berryhill, No. 14-1916, 2018 WL 8053775, at *19 (E.D. Pa. Oct. 23, 2018), report and recommendation adopted, No. 14-1916, 2019 WL 1651704 (E.D. Pa. Apr. 17, 2019) (upholding ALJ determination discrediting subjective complaints by contrasting medical record notations documenting claimant's subjective complaints with those documenting objective examination findings).

The April through December 2015 records Kichline cites from her primary care provider show that she described her headaches as "manageable," even though medication did not always resolve them. R. at 294, 298. Kichline's primary care provider suggested at different times that her headaches could at least be partly attributable to other conditions, such as vision issues or uncontrolled asthma. Id. at 298, 881. Those conditions were treated independently and Kichline's headaches were managed with over-the-counter medications and a referral to neurology. Id. at 293. Similarly, the March and August 2015 neurology records Kichline cited include her reports that her headaches are "sometimes" relieved by medication or applying pressure to her head. Id. at 450. Her neurologist also considered whether some of her headaches were caused by her vision problems. Id. at 451. Finally, in a June 2015 psychiatric evaluation, Kichline reported a "history of migraine for which she takes [prescription medication] as needed." Id. at 1434. Such records provide substantial evidence to support the ALJ's determination that Kichline's headaches could be "resolved by medication." Id. at 956.

Substantial evidence also supports the ALJs determination that Kichline's headaches caused no functional limitations. Id. During an August 2015 evaluation by a consulting psychiatrist, Kichline reported her history of migraines, but failed to identify any resulting

5

functional limitation. Id. at 372-380. Kichline also detailed her experience of frequent migraines to her physical therapists, but attributed her concentration difficulties to neck and shoulder pain. Id. at 251, 254. No physical therapy records document her suffering from a migraine or any functional limitation from the condition. Moreover, a June 27, 2016 physical therapy record – three days before Kichline's DLI – shows she was tired and achy from extensive recreational walking but making progress on the treadmill exercises; migraines are not mentioned at all. Id. at 681. Although those records document Kichline's headache complaints, they fail to show any functional limitations.

The records from Kichline's rheumatologist show that she reported "frequent headaches," but also that those headaches were never once her "chief complaint" from October 2015 through January 2020. Id. at 729, 734, 739, 744, 749, 754, 758, 762, 1601, 1606, 1611, 1615, 1620, 1625, 1630, 1635, 1640, 1646. Although she reported those "frequent headaches" in response to the specific "Review of Systems" questions, in response to the more open narrative inquiry, she described her headaches as "unchanged" for her first two visits, and then failed to mention them again. See, e.g., id. at 731, 736, 741, 746, 751. Her rheumatologist's "discussion/summary" attributed her overall pain to fibromyalgia and Vitamin D deficiency but never once specifically addressed her headaches. Id.

Kichline's August 2015 brain MRI was normal and showed no signs of prior migraines. Id. at 468-72. The August and September 2015 records Kichline cited from her pain management specialist do not reach a diagnosis of migraine headaches at all; instead, her specialist listed the headaches she reported experiencing only as an "associated complaint" of her neck pain. Id. at 933. The cause of her overall pain was determined to be "multifactorial," consisting of: (1) fibromyalgia; (2) chronic joint pain; (3) myofascial muscle pain; and (4)

6

cervicalgia. Id. at 932. Kichline was prescribed pain medication designed to be gradually increased to an optimal dose. Id. at 925-26.

My review of the longitudinal record shows that Kichline told her providers she had been experiencing headaches since she was 11 years old. Id. at 443. She reported different headache frequencies to different providers, compare, e.g., id. at 304 (March 2015 report to primary care provider of headaches three or four days per week) with id. at 450 (March 2015 report to neurologist of headaches once or twice per day), and they were at various times attributed in part to her uncontrolled asthma, id. at 298, unaddressed vision condition, id. at 881, and fibromyalgia, id. at 932. The only record I could find connecting Kichline's headaches to a functional limitation was a single note that she reported missing one day of her partial hospitalization program in August 2015 due to a migraine.[6] Id. at 909.

Kichline further contends the ALJ failed to properly explain his treatment of the medical record in discussing her migraines. Pl. Br. at 20 (citing SSR 96-8p). I disagree. Thomas v.

---

[6] In support of her argument that the ALJ failed to recognize the severity of her migraines, Kichline argues he should have found her headaches met the severity of Listing 11.03. Pl. Br. at 19. The Listing of Impairments in Appendix 1, Subpart P, Part 404 of 20 C.F.R. is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background. Sullivan v. Zebley, 493 U.S. 521, 532 (1990). The Listing defines impairments that would prevent an adult, regardless of age, education, or work experience, from performing any gainful activity, not just substantial gainful activity. Id.; 20 C.F.R. § 404.1525(a), (purpose of the Listing is to describe impairments severe enough to prevent a person from doing any gainful activity). The Listing was designed to operate as a presumption of disability, making further inquiry unnecessary. Sullivan, 493 U.S. at 532.

Although the ALJ did not address this specific listing, R. at 957-58, he was not required to do so "as long as the ALJ's review of the record permits meaningful review of the step-three conclusions." Lopez v. Comm'r of Soc. Sec., 270 F. App'x 119, 121 (3d Cir. 2008) (citing Jones v. Barnhart, 364 F.3d 501 (3d Cir. 2004)). The ALJ addressed the evidence and functional limitations caused by Kichline's asthma, musculoskeletal impairments, pain, obesity, and mental impairments, and explained why they did not meet Listings level. R. at 957-58. This is sufficient for judicial review. Lopez, 280 F. App'x at 121.

Comm'r Soc. Sec., No. 20-2296, 2021 WL 2010823, at *4 (3d Cir. May 20, 2021) (ALJ who accurately and comprehensively summarized medical record is not required to cite "every relevant treatment note"). Despite the single record showing Kichline missed one day of her psychiatric program due to a headache, the overall medical record supports the ALJ's conclusion that, during the applicable time period, Kichline's migraines did not prevent her from working. Id. at 956, 963. The ALJ's inference that Kichline's headaches were short-lived is reasonable based on the evidence. Id. at 956. His RFC includes limitations to accommodate any effect on her concentration and focus. Id.

Because the record does not show that Kichline's migraines caused more than a minimal functional impairment and the ALJ provided substantial evidence to support his categorization, I find the ALJ did not err in finding them non-severe. See Page v. Barnhart, 108 F. App'x 735, 738 (3d Cir. 2004) (upholding ALJ determination that migraines were not a severe impairment when claimant produced no medical evidence substantiating a specific functional impairment). Nonetheless, I also hold that, because the RFC accounted for any impairment in concentration or focus that Kichline attributes to the headaches, and because the record does not support Kichline's contention that the migraines, alone or in combination with her other impairments, would have caused excessive absences, I find that even if the ALJ had erred in categorizing Kichline's migraines, this error was harmless. Salles, 229 F. App'x at 145 n.2.

The ALJ sufficiently explained his analysis of Kichline's headaches to allow for judicial review, Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000) (ALJ analysis must allow courts to determine "if significant probative evidence was not credited or simply ignored"), and supported his analysis with substantial evidence, Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (defining substantial evidence as only "more than a mere scintilla").

II.     Failing to Properly Weigh the Medical Source Opinions

Kichline also contends the ALJ improperly weighed the medical source opinions.[7] Pl. Br. at 22. I disagree.

Dr. Black

Kichline submitted no medical opinion from Dr. Dillon, her primary care provider through her DLI. R. at 845, 859. Instead, she submitted an opinion from another doctor in that same practice, Dr. Black, who saw Kichline for the first time in August 2016 and began managing Kichline's care only after the June 2016 DLI had passed. R. at 845, 850. Dr. Black explicitly limited her opinion to Kichline's condition after the DLI. Id. at 432 ("The above opinion pertains to my patient from the date of 8/10/16 to the present"). Kichline argues Dr. Black's opinion should nonetheless bind the ALJ because Dr. Black had access to Kichline's pre-DLI primary care records and there is no evidence of a significant change in her condition between the DLI and Dr. Black's opinion. Pl. Br. at 23.

In her November 2016 opinion, Dr. Black opined that Kichline's conditions would likely cause her to be absent from work more than five days per month, and arrive late or leave early more than three days per month.[8] Id. at 894. She opined that Kichline could stand or walk for more than two but less than six hours in an eight-hour workday, could sit for only one hour at a

---

[7]     Because Kichline's claim was submitted before March 2017, it is subject to the "treating physician rule," which requires the ALJ to give controlling weight to uncontradicted, well-supported opinions of treating physicians. See 20 C.F.R. § 404.1527.

[8]     On their own, these levels of absenteeism would preclude full-time work. R. at 72, 74.

9

time, and was "limited" in her ability to use her upper extremities for full-time work.[9] Id. at 891-92.

Dr. Black's three medical opinions are all dated after the DLI. Id. at 429-32, 891-94, 1597-1600. The ALJ gave "little weight" to the first opinion, dated November 23, 2016, because: (1) the opinion limits its own application to no earlier than August 10, 2016; (2) Dr. Black found many of Kichline's functions "limited" but failed to define that degree of functionality; (3) Dr. Black's treatment notes from the day she wrote the opinion are inconsistent with her opinion regarding the excessive absences she opined Kichline's conditions would cause; and (4) the shoulder scan performed close in time to the opinion was negative. Id. at 965. The ALJ noted that the second and third opinions, offered even farther from the DLI, suffer from these same flaws and further fail to explain their differences from Dr. Black's August 2016 opinion. Id.

The ALJ's analysis of Dr. Black's opinion is supported by substantial evidence. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011). Dr. Black's treatment notes from the days she wrote her opinions fail to substantiate the extensive limits she recommended. The same day Dr. Black offered her initial opinion, she noted that Kichline "report[ed] feeling well-controlled" on her psychiatric medication regimen, that she had failed to attend all prescribed physical therapy sessions, and that her gastrointestinal symptoms had resolved. Id. at 833-34. The results of her physical and mental status exams were normal. Id. at 837. Dr. Black had declined to write an opinion in support of Kichline's benefits application during their prior

---

[9]     It is not clear that Dr. Dillon, Kichline's primary care provider during the relevant time period, would have offered a similar opinion. See, e.g., id. at 867 (notes from Dr. Dillon's December 2015 exam that Kichline "reports she is doing well and stable on all of her medications," and "all chronic conditions are managed appropriately, no pain exacerbations, following with rheumatology").

10

appointment in October 2016 because "her breathing and fatigue ha[d] not been fully optimized and evaluated yet." Id. at 839. Between the October and November 2016 appointments, Kichline underwent the sleep studies Dr. Dillon had originally recommended in August 2015, id. at 881, and was prescribed a CPAP machine. Id. at 562, 559. Her carpal tunnel surgeries were found successful except for reported swelling "after she does a lot of work." Id. at 636.

When Kichline returned to Dr. Black in November 2016, having followed up on her treatments as instructed, Dr. Black adjusted Kichline's asthma medication and arranged for a different kind of CPAP machine. Id. at 833. Dr. Black noted that "the above was completed following multiple discussions with the patient regarding her self-reported deficiencies that would interfere with her ability to work." Id. 432. The ALJ accurately identified a conflict between Dr. Black's opinion, which states Kichline's conditions would cause her to be absent more than five days per month and leave early or come late another three days per month, and her treatment notes, which suggest medical treatments were successful when Kichline sought and followed up on them. Id. at 965. Such reasoning is a valid basis for discrediting the medical opinion. Tedesco v. Comm'r Soc. Sec., 833 F. App'x 957, 961 (3d Cir. 2020); see also, e.g., R. at 881 (noting that Kichline had to be reminded to make appointments with specialists, keep appointments for MRIs, obtain lab work ordered by neurology, schedule recommended carpal tunnel surgery and sleep study, and that her medications had to be re-sent to another pharmacy because Kichline had failed to pick them up from the first pharmacy).

Dr. Lee

Kichline argues the ALJ improperly discounted the opinion of her treating rheumatologist, Dr. Lee, that she could not reach at table height five days per week eight hours

11

per day, and that Dr. Lee's medical records support her complaints of work-preclusive shoulder pain, fatigue, and variable symptoms. Pl. Br. at 25-26. I disagree.

The ALJ gave "little weight" to Dr. Lee's opinion, explaining that: (1) Dr. Lee did not explain her opinion of Kichline's functionality beyond describing her as "limited;" (2) the opinion that Kichline was "limited" with respect to the use of her hands was inconsistent with other information in the record that showed Kichline played piano and video games through 2016; and (3) the opinion was inconsistent with Dr. Lee's own medical records, which fail to reference any manual dexterity limitations. R. at 966.

Kichline focuses her arguments on the plausibility of Dr. Lee's shoulder restriction, accurately noting that shoulder pain was a focus of her treatment with Dr. Lee and that Dr. Lee's observations of her shoulder limitations were consistent with those of other providers. Pl. Br. at 25. However, Kichline inaccurately describes her ability to continue playing piano throughout the insured period as mere "transitory" activity. Id. The evidence establishes that Kichline was "just interested in doing her music and sound production" and had "play[ed] the piano for 15 years." R. at 1434.

Moreover, Dr. Lee never opined that Kichline's manual dexterity was limited; she specifically opined Kichline had "no" limitations in "the ability to use her fingers for items such as counting money, buttoning, or using hands in a job that requires fine dexterity." Id. at 1660. She also found Kichline had "no" limitations in "using her hands repetitively for work such as assembly, sorting, and packing items . . . for 8 hours a day, 5 days a week, except for normally scheduled breaks." Id. By limiting Kichline to lifting or carrying up to 10 pounds "occasionally," but finding she could walk or stand for 1-2 hours out of an 8-hour day, 5 days per week, and imposing "no" limitation "in the ability to sit for work-related activities," Dr. Lee

12

effectively reached the same conclusion as the ALJ, who found Kichline could perform a limited range of sedentary activities. Id. at 958, 1659-60; see also 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."). Although Dr. Lee opined Kichline's symptoms were variable, she did not find they would cause regular absences from a full-time job. R. at 1662.

The only direct conflict between Dr. Lee's opinion and the ALJ's RFC appears to be that Dr. Lee found Kichline could "never" balance, kneel, crouch, or crawl, while the ALJ found she could do so "occasionally." Id. at 958, 1660. Dr. Lee found Kichline was "limited" in her ability to reach at table level for 8 hours a day, 5 days a week, id. at 1660, but the ALJ also limited Kichline's actions requiring manual dexterity by finding she could perform these tasks "frequently," i.e. not constantly, id. at 958. The ALJ's observations that Dr. Lee's opinion lacked specificity and that the evidence showed Kichline possessed manual dexterity are accurate. Id. at 375 (in 2015 Kichline's "hobbies and interests include playing piano and video games"), 438 (in 2015 Kichline "doesn't use her left hand too much, mostly to play piano"), 1660 (opinion for 2015-2020 finding Kichline's ability to reach at tabletop level full-time "limited"), 1443 (Kichline's recommended "de-escalation" techniques in 2019 include playing piano and video games), 1474 (same in 2018).

The ALJ provided sufficient explanation for his treatment of Dr. Lee's opinion. Tedesco, 833 F. App'x at 961. Even if he had not, however, this error would have been harmless because Dr. Lee's opinion supports the ALJ's RFC. Woodson, 661 F. App'x at 766.

13

Adrienne Baker

Kichline contends the ALJ erred by giving "little weight" to the opinion of her therapist Adrienne Baker, who opined that Kichline's paranoia and visual and auditory hallucinations would preclude full-time work. Pl. Br. at 26-27. I disagree.

The ALJ explained that he gave "little weight" to Baker's opinion because: (1) Baker is not an "acceptable medical source,"; (2) the opinion was not consistent with the record as a whole; (3) the opinion was internally inconsistent; (4) Kichline's care was routine and conservative; and (5) the record showed Kichline's condition had improved. R. at 967.

The ALJ provided substantial evidence to support his findings. Biestek, 139 S.Ct. at 1154. The ALJ correctly concluded that the treating physician rule does not apply to Baker. SSR 06-03P, 2006 WL 2329939, *2 (S.S.A. Aug. 9, 2006) ("only 'acceptable medical sources' can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight"). He properly considered Baker's opinion based on her ongoing treatment of Kichline. R. at 967; SSR 06-03p, 2006 WL 2329939, *5.

The ALJ accurately summarized Kichline's mental health symptoms, including mood instability, paranoia, and hallucinations, as well as her treatment, which included medications and the 2015 partial hospitalization program. R. at 962. He also noted the normal results of her mental status examinations and her improvement with medication. Id. He explained that his RFC included limits to routine and repetitive tasks with only occasional interaction with supervisors, co-workers, and the public because of her mental impairments. Id. at 963; see Bartmas v. Saul, No. 19-133, 2020 WL 1061473, at *4 (W.D. Pa. Mar. 5, 2020) (upholding ALJ opinion assigning little weight to internally inconsistent opinion of treating physician that claimant could manage benefits in her own interest and whose records reflected routine and

14

conservative treatment and normal mental status examinations but who also opined claimant was severely limited). The ALJ fairly assessed Baker's opinion as internally inconsistent because it stated that Kichline was significantly limited due to her impairments yet still capable of managing her own benefits. R. at 967. See Drzal v. Saul, No. 18-10316, 2020 WL 1528039, at *9 (D.N.J. Mar. 31, 2020) (upholding ALJ opinion assigning little weight to "internally inconsistent" therapist opinion that claimant was profoundly impaired but able to manage benefits in her own interest) (citing Wimberly v. Barnhart, 128 Fed. Appx. 861, 863 (3d Cir. 2005)).

Dr. Guerra

Kichline argues the ALJ erred by assigning "little weight" to the opinion of her treating psychiatrist, Dr. Guerra, who opined she had "no useful ability to function" in every functional area listed, including adhering to basic standards of neatness and cleanliness. Pl. Br. at 28-29; R. at 427-28. I disagree.

The ALJ explained this opinion was inconsistent with the record and internally inconsistent. R. at 967. For example, the ALJ noted Dr. Guerra's assessment that, despite such profound limitations, Kichline could manage benefits in her own interests. Id. at 428, 967. The ALJ provided substantial evidence to support his determination. Dr. Guerra's assessment that Kichline had "no useful ability" to, e.g., "understand and remember short, simple instructions," is inconsistent with her assessment that Kichline could manage benefits in her own interest. Id. at 427-28. The ALJ supported his summary of Kichline's treatment as routine and conservative and resulting in improvement, id. at 966-67, which conflicts with Dr. Guerra's dire assessment of Kichline's functionality. Compare, e.g., id. at 372, 962 (ALJ opinion quoting consultative psychologist report from evaluation for which Kichline drove approximately 40 miles roundtrip

15

and in which she reported she has a "great" relationship with her aunt), with 428 (Dr. Guerra opinion that Kichline has "no useful ability" to "travel in unfamiliar places" or "get along with co-workers and peers").

The ALJ acknowledged and accounted for significant functional limitations caused by Kichline's mental impairments, but properly discounted the extreme opinion of Dr. Guerra. See Kerdman v. Comm'r of Soc. Sec., 607 F. App'x 141, 144 (3d Cir. 2015) (upholding ALJ opinion assigning little weight to treating physician opinion with "extreme" limitations that was inconsistent with the overall record and consulting physician opinion).

Dr. Adams

Kichline argues the ALJ improperly assigned "partial weight" to the opinion of consulting psychologist Stephanie Adams, who opined Kichline had no limitations in understanding, remembering, and carrying out simple instructions, interacting with co-workers and supervisors, and functioning in a workplace setting, and only moderate limitations with more detailed and complex work. Pl. Br. at 29-30. Kichline contends that Dr. Adams's assessment was based on a single interview without review of medical records and that it did not adequately consider Kichline's work history. Id.

The ALJ explained that he assigned the opinion "partial weight" despite those limitations because it was consistent with Dr. Adams's report of her own examination and "generally" consistent with the medical record as a whole. R. at 966. Moreover, the ALJ limited Kichline beyond Dr. Adams's recommendations. Id. at 958 (limiting Kichline to routine work settings with routine and repetitive tasks and only occasional interaction with co-workers, supervisors, and the public). The ALJ provided substantial evidence to support his assessment of this consulting psychologist opinion. Kerdman, 607 F. App'x at 144.

16

Tom Miller

Kichline contends the ALJ erred by assigning little weight to the opinion of the therapist she began seeing in 2019 and was still seeing at the time of her 2020 submission, Tom Miller. Pl. Br. at 30-31. Kichline acknowledges that her treatment with Mr. Miller started well after her DLI but argues the consistency of his opinion with the earlier opinions of other treating providers demonstrates ongoing disability and bolsters the credibility of the earlier opinions. Id.

Miller, however, opined that Kichline's overall mental functioning was subject to something between a "moderate and marked" limitation. R. at 1652. The ALJ assigned Miller's opinion "little weight," and addressed the specific areas in which Miller had found Kichline subject to "marked" or "extreme" limitations, including interacting with the general public and traveling in unfamiliar areas or on public transportation. Id. at 968. He explained his assessment by noting: (1) Miller was not an acceptable medical source; (2) his opinion and treatment were after the DLI; and (3) the opinion was inconsistent with the evidence showing that, at the time of treatment, Kichline was working 3-4 days per week and getting along with co-workers. Id. The ALJ provided substantial evidence to support his assessment. 20 C.F.R. 404.1527(c)(4); Biestek, 139 S. Ct. at 1154.

III. Failing to Support the RFC with Substantial Evidence

Kichline contends the ALJ failed to support his RFC with substantial evidence. Pl. Br. at 31-34. She primarily argues the ALJ improperly discredited her complaints of fatigue, pain, headaches and limited manual dexterity as well as the record evidence that she contends corroborate her complaints. Id.

The ALJ based his RFC on a thorough review of the overall record and medical opinions. R. at 959-69. He accurately noted Kichline's complaints of fatigue, pain, and mental

impairments, including how they progressed over time. Id. at 959. He thoroughly reviewed the medical record of her physical conditions, including her continued and repeated complaints and the continued and repeated normal examination results. Id. at 960-61. He also accurately reviewed her mental health treatment records, including the daily activities she reported to consulting psychologist Dr. Adams. Id. at 962-63.

The ALJ explained that he did not fully credit Kichline's reported functional limitations because the record "simply [did] not support them." Id. at 963. With respect to her physical conditions, he noted that: (1) her care has been routine and conservative; (2) her conditions have improved; (3) she had good results from her original carpal tunnel surgeries and her symptoms relapsed only recently; (4) she had maintained full muscle strength despite her fibromyalgia; and (5) she had maintained intact reflexes despite her fibromyalgia. Id. With respect to her mental conditions, he noted that: (1) her care has been routine and conservative; (2) her conditions have improved; and (3) her activities of daily living include significant work activity and activities that involve significant manual dexterity, like playing piano and video games. Id. Finally, as described above, he properly weighed the medical source opinions. Id. at 963-969.

The RFC the ALJ provided includes substantial limitations and would preclude the work Kichline testified she could not perform. Id. at 958. He provided substantial evidence to support his determination that she would be capable of performing the limited range of sedentary work allowed by the RFC. Id. at 959-69.

In terms of the specific limitations Kichline claims the ALJ ignored, the ALJ addressed the two functional limitations attributed to her headaches by accommodating her impaired focus and concentration in the RFC and finding her allegations that her headaches would require excessive absences from work were not supported by the record. See Section I, supra. The pain

and fatigue caused by her fibromyalgia were accommodated with a limitation to a restricted range of sedentary work. R. at 958. The ALJ did not overlook Kichline's fibromyalgia but rather specifically noted the presence of tender points in her rheumatology exams, the diagnostic criteria for fibromyalgia. Id. at 963; SSR 12-2P, 2012 WL 3104869, *3 (S.S.A. July 25, 2012). His RFC is well-aligned with that of the doctor primarily responsible for treating Kichline's fibromyalgia, Dr. Lee. R. at 958, 1659-60. Despite her fibromyalgia, both Dr. Lee's opinion and Kichline's activities of daily living support the ALJ's determination that she is able to perform work that requires only frequent table-height activities involving manual dexterity. Id. at 958, 1659, 1434, 1443. The ALJ supported his RFC with substantial evidence. Biestek, 139 S. Ct. at 1154.

    IV.    Failure to Properly Interpret VE Testimony

Finally, Kichline argues the ALJ improperly relied on VE testimony to support his denial of benefits because Kichline's conditions prevent her from using her hands at table height full-time and from regularly attending a full-time job. Pl. Br. at 35.

Kichline states that the jobs identified by the VE would require the use of her hands and arms "at table level for 8 hours a day, 5 days a week." Id. This assertion contradicts the VE testimony and is not attributed to another credible source, like the Dictionary of Occupational Titles. R. at 69-74; Pl. Br. at 35. The ALJ's hypothetical to the VE included only frequent use of the hands, and the VE testified these jobs can be performed with that limitation. R. at 70, 72. The ALJ was not required to accept Kichline's unsupported contention that her conditions make it impossible for her to attend a full-time job. Zirnsak v. Colvin, 777 F.3d 607, 615 (3d Cir. 2014) ("the ALJ is only required to submit credibly established limitations" to the VE).

An appropriate order accompanies this opinion.